ELLA BYERLY, Appellant, v. CONSOLIDATED LIGHT, POWER AND ICE COMPANY, Respondent.

Kansas City Court of Appeals, April 6, 1908.

1. ELECTRIC WIRES: Negligence: Care. Courts appreciate the utility of electricity and have no desire to destroy its use; but those engaged in the transmitting of its highly destructive currents must exercise the highest degree of care to prevent its escape from the carrying wires.

2. ———: ———: ———: Master and Servant: Tortfeasors. A transmitter of electricity over mining premises where the servants of the mining company in the discharge of their duties approach dangerously close to such wires should either insulate its wires or elevate them beyond the danger line; and the negligence of the mining company in raising its servants' place of work and the negligence of such servants in assisting in such work will not exclude the negligence of the electric company, since the negligence of one tortfeasor is no legal justification for the negligence of the other.

3. ———: ———: Causal Connection: Evidence. Evidence reviewed and held to show in its aspect most favorable to the plaintiff that the death of her husband might as consistently have been produced by another cause as the one alleged in her petition, since it is axiomatic that where the court and jury are left by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with supposition, the plaintiff has failed in the burden of proof which the law casts upon him.

130 App.—38

Appeal from Jasper Circuit Court.—*Hon. Howard Gray*, Judge.

Affirmed.

*Hiram W. Currey*, with whom is *Edward G. Sapp* and *S. C. Cheeseman*, for plaintiff.

It has been the settled law of this State since the case of Buesching v. St. Louis, etc., Co., 73 Mo. 219, decided in 1880, that a demurrer to evidence admits not only facts tesitfied to by witnesses, but all of the facts which the evidence tends to prove, etc. Montgomery v. Railroad, 181 Mo. 504; Moore v. Transit Co., 95 Mo. App. 728; Berry v. Railroad, 124 Mo. 245; Holloway v. Kansas City, 184 Mo. 29; Toohey v. Fruin, 96 Mo. 110; Morrel v. Car Co., 98 Mo. App. 356; Myers v. Transit Co., 99 Mo. App. 369; Brooks v. Railroad, 98 Mo. App. 69. (2) The plaintiff was not required to prove the defendant's negligence or that such negligence was the proximate cause of the death of her husband, by direct evidence; and she was entitled to prove the primary fact of negligence and proximate cause of death, by circumstantial evidence. Settle v. Railroad, 127 Mo. 340; Cambrow v. Railroad, 165 Mo. 558; Longree v. Mfg. Co., 120 Mo. App. 478. (3) Whether the plaintiff's husband was killed through negligence contributing to his death, which precludes a recovery, under the evidence in this case, is a question for the jury. The presumption here obtains that the deceased was careful instead of negligent, and it was for the respondent to overcome that presumption by the preponderance of evidence. Rogers v. Print. Co., 103 Mo. App. 688; Priesmeyer v. Transit Co., 102 Mo. App. 518; Riski v. Transit Co., 180 Mo. 168; Griffith v. Everett, 98 Mo. App. 32; Goff v. Transit Co., 199 Mo. 694; Charata v. Railroad, 200 Mo. 413; Chaffee v. Carthage, 200 Mo. 616; Stotler v. Railroad, 200 Mo. 107. (4) The wires carrying the current of electricity which killed plaintiff's husband, were under

the exclusive control of the defendant company; and, in such case the plaintiff makes out a prima-facie case by showing such facts as warrant the interference that her husband came to his death by defendant's negligence. Redmond v. Railroad, 185 Mo. 1, 10; Briggs v. Railroad, 109 N. Y. 297; Ennis v. Gray, 34 N. Y. Supp. 383; Griffin v. Manice, 160 N. Y. 194; Ground v. Railroad, 91 N. Y. Supp. 202; Crovally v. Railroad, 89 N. Y. Supp. 577. (5) The circumstances were such as to charge the defendant company with the utmost care to prevent injury to the persons who were required to pass daily under and near its wires. Winkleman v. Light Co., 110 Mo. App. 184; Wilbert v. Brick Co., 106 N. W. 1058, 129 Wis. 1; Macow v. Paducah, 110 Ky. 689, 62 S. W. 496; Simmons v. Shreveport, etc., Co., 41 So. 248; Brown v. Illuminating Co., 46 L. R. A. 745; Garaudi v. Electric Co. 28 L. R. A. 596; Griffen v. Light Co., 164 Mass. 492, 41 N E. 675; Illingsworth v. Light Co., 161 Mass. 583, 37 N. E. 778; Potts v. Shreveport, etc., Co., 110 La. 1, 34 S. 103; Haynes v. Gas Co., 19 S. E. 334; Snyder v. Electrical Co., 28 S. E. 733; Harlan v. Light & Power Co., 124 Ia. 500, 100 N. W. 508; Brown v. Edison Co., 46 L. R. A. 745; Barto v. Telephone Co., 120 Ia. 241; 101 N. W. 876; Steindorf v. St. Paul, etc., Co., 100 N. W. 221, 92 Minn. 496; Carroll v. Electric Co., 84 Pac. 389; Tel. Co. v. Sokola, 73 N. E. 143; Schweitzers v. Citizens, etc., Co., 52 S. W. 830 (Ky.); 15 Cyc., pp. 472-3; Gilbert v. Duluth, etc., Co., 93 Minn. 99, 100 N. W. 653; Thomas v. Wheeling, etc., Co., 46 S. E. 217; Tripple, etc., Co. v. Wellman, 114 Ky. 79, 70 S. W. 49.

*John A. Eaton, Dudley W. Eaton* and *E. H. McVey* for respondent.

(1) We have no fault to find with the rule of law contended for in point 1. We, however, deny its application here. (2) Counsel for appellant would have this court hold that the jury might have inferred from

the evidence that the electric wire of the defendant caused the death of plaintiff's husband. Counsel cite the case of Settle v. Railroad, 127 Mo. 340. In that case the injury occurred, so the jury inferred, from a bent handhold on the end of a freight car. Conclusive proof was offered that the handhold was bent and the jury were not in that case asked to infer that plaintiff was using the handhold, for that fact was affirmatively proven. (3) The presumption that Byerly was at the time of his death in the exercise of due care was absolutely overthrown by the testimony, which showed that he was guilty of negligence which caused his death, in that, if electricity caused his death, he carelessly permitted his body to come in contact with wires the elevation, position and dangers of which he knew. This presumption is one which only obtains when evidence upon that question is lacking, and may be rebutted by plaintiff's own testimony. Rogers v. Myerson Ptg. Co., 103 Mo. App. 688; Priesmeyer v. Transit Co., 102 Mo. App. 518; Reska v. Railroad, 180 Mo. 187; Stotler v. Railroad, 200 Mo. 147. (4) It may be conceded for the purposes of this case that the wires of respondent were in its exclusive control. But the tailings pile which was built up under the wires was in charge of Byerly as the employee of the Mining Company, charged with the duty of building it. The wires of defendant would have been no source of danger to him but for the growth of the tailings pile, and but for that pile and its growth he could not have come in contact with the wires, if he did. Hence, the facts in this case do not authorize the presumption that Byerly came to his death from the act of the respondent, let alone its negligence. (5) The error in appellant's fifth point is that it does not contemplate enough of the facts. It is true that defendant's wires were uninsulated, but it is also true that Byerly knew that fact; this is too obvious to need argument. Walker knew it as well as every other employee about

the mill. Byerly knew it, because his duties took him to a place which afforded him a peculiar opportunity of knowing it. Zumault v. Railroad, 175 Mo. 288; Doerr v. Brewing Ass'n, 176 Mo. 547; Hogan v. Railroad, 150 Mo. 36; Matthews v. Elevator Co., 59 Mo. 474; Wray v. S. W. E. L. & W. P. Co., 68 Mo. App. 380; Winkelman v. Light Co., 110 Mo. App. 190.

JOHNSON, J.—Plaintiff, the widow of Williard E. Byerly, deceased, alleges in her petition that the death of her husband was caused by the negligence of defendant in maintaining wires carrying electric currents of high power in dangerous proximity to the place where her husband was required to work. At the conclusion of the introduction of plaintiff's evidence, the court gave the jury an instruction peremptorily directing a verdict for defendant, whereupon plaintiff took a nonsuit with leave to move to set the same aside and, in due course of procedure, brought the case here by appeal.

At the time of his death which occurred in the morning of August 4, 1906, Byerly was working at mill No. 5 of the Mercantile Mining Company situated near Webb City but outside of its corporate limits. The production of lead and zinc from ore was the object of the operations conducted at the mill and Byerly was employed to work at the "sludge table" an appliance for the separation of fine ore from sand. Water runs from the table continually and the operators are likely while at work to have their clothing moistened. A large tailings elevator was operated in connection with the mill. Its function was to carry off the refuse or tailings from the mill and deposit them in a pile. The spout from which the tailings (mixed with water) were discharged on to the pile was about 125 feet from the sludge table and in plain view therefrom. When the pile, which was situated on the mill premises, grew to the height of the spout, a mill trough or flume was put

in to carry the tailings away from the spout for deposit and, as necessity demanded, the length of the flume was extended from time to time. By this process, the pile had reached a length of, perhaps, 150 feet. Its highest point was at the end under the spout where it had attained a height of about forty-five feet. From that point, it gradually sloped to the ground. The flume ran along the crest and therefore sloped downward from the spout to the place of discharge. Occasionally, the flume became choked by the stoppage and accumulation of refuse and it was one of Byerly's duties to keep it clear. To do this, it was necessary for him to ascend the pile to the place where the flume was choked and to remove the obstruction with a scoop shovel. The mill had been in operation about four months and Byerly had been employed during that time in the capacity described. Defendant was engaged in the business of generating and supplying electricity for use in various mining mills and plants in that vicinity. Its product was distributed from its power house by means of wires carried on poles. One of its lines carrying four wires was built across the premises of the Mercantile Mining Company. The wires were strung about twenty-five feet above the ground and were uninsulated. When built, the line entirely cleared the tailings pile, but in time as the pile grew and extended in length, deposits were made under the line until on the day of the occurrence in question, the lowest wire was not more than five feet above the crest of the pile underneath. About a week before, defendant at the request of the mining company, had elevated the wires by raising the height of one of the poles in that section some eight or ten feet, but in the meantime the pile had grown to the height stated.

The nature and conditions of the right given by the mining company to defendant to build and maintain the line over its premises are not disclosed and we have no means of knowing which one of the parties was bur-

dened with the duty of preventing interference between the expanding refuse pile and the wires. All we know is that the line was there, presumably by permission of some sort from the mining company and that the wires were raised by defendant at the request of the mining company, but we do not know whether the latter work was done at the expense of defendant and in performance of a contractual obligation imposed on it by the terms of the grant or was done at the charge of the mining company. No one witnessed the death of Byerly. He was observed to leave the sludge table and ascend the tailings pile for the purpose of clearing the flume. An hour afterward, the engineer of the mill saw him lying on the pile, went to him and found him dead. He was lying directly under the wires, partly on one side and partly on his face, his head pointing up hill, his mouth filled with the wet tailings. Across his forehead, extending from the hair to one eye, was a gash cut to the bone. There was no other mark of violence on his person. His hat of felt was wet and bore a discolored spot on the front. There is no evidence that hat or clothing were wet when he ascended the pile or that the discoloration mentioned was produced by scorching. *Rigor mortis* set in early and continued long. Brown spots appeared on the body indicative of capillary congestion. These things, the experts say, were symptomatic of death produced or accompanied by intense nervous shock. The flume near which the body was found was constructed of sheet iron turned up at the edges to form a trough. The shovel used was an ordinary iron scoop with metal strips running up the handle. It appears quite clearly that defendant knew of the growth of the tailings pile under its wires. Further, it is shown that Byerly was required to go on the pile three or four times every day; that children played there and on Sundays visitors were accustomed to go there. The wires with which it was possible for Byerly

to have come in contact carried a powerful current of electricity. He knew the wires were uninsulated and that contact with them would be highly dangerous.

Plaintiff alleges in the petition: "That it was the duty of defendant company to so string its said wires far enough above the said tailing pile and flume and spout, aforesaid, as to enable the employees of the said Mercantile Company to pass under the same without coming in contact therewith, and to so keep and maintain its said wires; that it was the duty of the defendant to keep its said wires strung taut, so as to prevent the same from sagging and thereby coming down and in contact with the aforesaid employees, and particularly the plaintiff's said husband, and to keep said wire and wires insulated and guarded as a necessary protection to prevent injury to the employees, aforesaid; and also to inspect its said wires from day to day at frequent intervals, as a necessary precaution to prevent injury to the employees aforesaid, and it was also the duty of the said defendant to inform persons whom it knew would, from time to time, in the performance of their duty as the employees of the said Mercantile Company, necessarily pass under or near its said wires, of the liability of said wires to fall or sag, and that said wires were not insulated, and carried a dangerous voltage of electricity, as a necessary precaution for the lives and bodies of such employees."

The cause of action asserted is predicated on the negligent breach of such duties. The answer raises the issue of defendant's negligence and presents contributory negligence and assumption of risk as affirmative defenses.

The first question suggested by the facts stated is whether defendant owed a duty to the servant of the proprietor of the land crossed by its wires either to insulate its wires or to maintain them at a height beyond the reach of persons rightly on the premises who were

likely to pass under them. No contractual relation existed between defendant and Byerly. He was the servant of the mining company at work on its premises and in its business. It owed him the duty incidental to the relationship of master and servant of exercising reasonable care to provide him a reasonably safe place in which to work. Defendant owed him no such duty, nor does it appear as between defendant and the mining company, the former was charged with the contractual obligation to keep its wires out of the way of the constantly expanding tailings pile. But freedom from such obligations did not absolve defendant from the duty of exercising the greatest care to protect the employees of the mining company, whose work compelled them to come under the wires, against risk of injury therefrom. The wires carried a high voltage of electricity, a force invisible, subtle, powerful, inconceivably swift in motion, eccentric, and of great conductibility. The utility of this agency is fully appreciated by the courts and no desire is entertained to restrict its use, but the fact that when it is not kept closely confined within appointed channels, its tendency to break loose and its capacity for evil are so great, impels the courts to lay down the rule that persons who engage in the business of transmitting highly destructive currents of electricity must exercise the highest degree of care to prevent their escape from the carrying wires. This principle was recognized by the Supreme Court in Geisman v. Electric Co., 173 Mo. l. c. 674, where it is said: "Electricity is one of the most dangerous agencies ever discovered by human science, and owing to that fact it was the duty of the electric company to use every protection which was accessible to insulate its wires at all points where people have the right to go, and to use the utmost care to keep them so; and for personal injuries to a person in a place where he has a right to be without negligence upon his part contributing directly thereto, it is liable in dama-

ges. [McLaughlin v. Louisville Electric Light Co., 100 Ky. 173.] And by this court in Winkelman v. Electric Light Co., 110 Mo. App. 184, where, speaking through Judge ELLISON, we declared that "considering the noiseless, hidden and destructive power of electricity, a reasonable effort to control it is nothing short of the utmost effort—nothing less than the utmost effort would be a reasonable effort."

In Telephone Company v. Sakolo, 73 N. E. 143, the Appellate Court of Indiana applied the rule that the transmitter of electricity owes the duty defined in the cases from which we have quoted to persons rightly on private property crossed by his wires though no relation exists between him and such persons: "There is reason in such cases for making some distinction between liability for injuries to persons on private property and liability for injuries to persons using a public street. But if the person injured is not a trespasser and has a right to be where he is when injured, the duty must extend to him to maintain the wires in a safe condition although the wires are maintained by the company across private property." [Citing Keasby on Electric Wires (2 Ed.), 247.]

Knowing, as it did, that the premises of the mining company were a place of industrial activity where many men were employed and that the tailings pile had approached dangerously close to the wires, it was the duty of defendant either to substitute insulated wires or to elevate those in place beyond the danger line. It is no excuse for it to say that the mining company was negligent in raising the pile and that Byerly was negligent because he assisted in that work. Presumably, Byerly was doing his master's bidding—a thing his duty as servant justified him in doing as long as the act he was ordered to perform was not glaringly and imminently dangerous. Conceding for argument that the mining company was guilty of a negligent breach of its

duty to be reasonably careful to provide a reasonably safe place for its servant, the most that may be said of that negligence is that it co-operated with the negligence of defendant to make the place dangerous.   Neither of such tortfeasors should be permitted to advance the negligence of the other as a legal justification or excuse of his own wrong.

Finding that defendant was negligent, the next subject of inquiry is whether the evidence reasonably supports the inference that such negligence was the producing cause of Byerly's death.   We sanction the contention of plaintiff that the causal connection needs not be shown by direct and positive evidence, but may be show by other facts and circumstances and that in the consideration of a demurrer to the evidence, every reasonable inference should be indulged in favor of the plaintiff. But the rule is elemental that the burden remains with plaintiff to the end of the case to establish by proof not only the fact of the negligence averred, but also to show a direct connection between such negligence and the injury. Where the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances, and it may be stated as an axiomatic rule that whenever court or jury is left by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with conjecture or supposition, the plaintiff must be held to have failed in his proof.   Where the evidence shows the injury might have been caused by the negligent act, but, in its aspect most favorable to plaintiff, is just as consistent with the inference that the injury might have been produced by another cause, to send the case to the jury would be to accord them the right to make an arbitrary choice between equally probable but unproved conclusions  and thus the verdict, if for the plaintiff, would be based not entirely on evidence, but in part on mere speculation

and conjecture. This would mean a reversal of the rule imposing the burden of proof on the plaintiff, since the defendant, in order to prevent the jury from making him the victim of conjecture, would be forced to assume the burden of showing that his negligence did not produce the injury. [Dunphy v. Stock Yards Co., 118 Mo. App. l. c. 516; Trigg v. Ozark Co., 187 Mo. 227; Goransson v. Mfg. Co., 186 Mo. 300.]

The application of this principle to the facts before us leads us to say that plaintiff has failed in her proof. The incised wound on Byerly's forehead indicated that he fell forward heavily and struck his head violently on the sharp edge, either of the flume or of the shovel. The cause of his fall is purely conjectural. It may be that his head or the uplifted shovel came in contact with the wire and he was stricken with a powerful charge of electricity, or it may be that he made a misstep, lost his balance and, in an effort to regain it, pitched forward, struck his head on the flume so violently that he became unconscious and perished from suffocation caused by his mouth becoming filled with mud. Other reasonable suppositions respecting the manner of his death might be indulged, but these sufficiently serve to exemplify our conclusion that the cause of the fall is altogether speculative. The fact that no burn was left on his body or clothing, though not conclusive, nevertheless, is against the theory that he received an electric shock. The post-mortem indications are as consistent with one theory as with the other, and we do not think the opinion of the undertaker who embalmed the body respecting the cause of death rises to the dignity of evidence. In such state of proof, it would be unjust to send the case to the jury and we must hold that the learned trial judge committed no error in sustaining the demurrer to the evidence.

The views expressed relieve us from the necessity of

discussing the questions of contributory negligence and assumption of risk.

The judgment is affirmed. All concur.